### GOODRICH–LOCKHART CO. v. SEARS et al.

(District Court, E. D. Kentucky, at Frankfort. February 4, 1919.)

No. 799.

1. **Attorney and client** ⬤⟿**63—Attorneys held in privity with plaintiff, whose agent was member of syndicate employing them.**

Where plaintiff's agent procured an option for the purchase of land, and attorneys were employed by a syndicate of prospective purchasers, of which plaintiff, through the agent, was a member, to give an opinion as to the title, the attorneys were in privity with plaintiff, and under the fiduciary relation to it of attorneys to a client.

2. **Fraud** ⬤⟿**13(1)—Representation may be fraudulent, though having basis of truth; "fraudulent representation."**

A representation made with fraudulent intent is fraudulent, where its implications are false, and made with intent to deceive, though there be a basis of truth underlying it.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraudulent Representation.]

3. **Attorney and client** ⬤⟿**114—Opinion of attorneys as to title of land held fraudulent.**

An opinion furnished prospective purchasers of land by attorneys *held* fraudulent, in the specific false statements as to the attorneys' opinion respecting the title, in the false inference intended to be thereby conveyed, and in essential matters concealed and withheld, which it was their duty to disclose.

4. **Vendor and purchaser** ⬤⟿**43(1)—Purchaser held not to have affirmed contract induced by fraud.**

Where plaintiff purchased land, taking the deed in the name of its agent in reliance on a fraudulent opinion as to the title, given by attorneys in collusion with the vendor, and subsequently took a substituted deed to itself, and executed a note and mortgage for the balance of the purchase price, but at the time thought there would be only a comparatively slight deficiency in acreage, the execution of the papers and acceptance of the new deed did not constitute an affirmance of the original purchase with knowledge of the fraud.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Vendor and purchaser ⊷113—Purchaser entitled to rescind, when vendor cannot give title to material portion.**

Where the false representation inducing the purchase of land relates to the quantity, and the vendor is unable to convey title to a material portion, constituting the principal inducement to the purchase, this is such injury as entitles the purchaser to rescind.

**6. Vendor and purchaser ⊷37(3)—False opinion of attorneys in collusion with vendors held representation of fact; "trade talk."**

Where attorneys in collusion with a vendor gave a prospective purchaser an opinion as to the title to the land, which was fraudulent and not their real opinion, such opinion was not mere "trade talk," but a representation of fact, and constituted ground for rescission.

**7. Corporations ⊷661(2)—Foreign corporation, doing business without complying with statute, is entitled to sue to rescind contracts.**

Assuming that a foreign corporation was carrying on business in Kentucky, and that its failure to comply with Ky. St. § 571, prevented it from enforcing a contract for the purchase of land, it might nevertheless sue to rescind the contract for fraud.

**8. Corporations ⊷661(2)—Foreign corporation's right to sue for rescission not defeated by prayer for alternative relief.**

The right of a foreign corporation, doing business in Kentucky without compliance with Ky. St. § 571, to sue for rescission of a contract on the ground of fraud, is not defeated by a prayer for reformation as alternative relief.

**9. Vendor and purchaser ⊷341(5)—Purchaser on rescission entitled to recover payment to third person as commission.**

On rescission of a contract for the purchase of land for fraud, the purchaser was entitled to recover the amount paid by it, including an amount paid to a third person on behalf of the vendor as a commission.

**10. Vendor and purchaser ⊷341(6)—Purchaser, on rescission, entitled to recover payment from vendor and attorneys participating in fraud.**

Where plaintiff's purchase of land was induced by the joint fraud of the vendor and attorneys giving a fraudulent opinion as to the title, plaintiff was entitled to a decree for the amount paid against all of them on a rescission of the contract.

**11. Vendor and purchaser ⊷341(5)—Allowance of interest on rescission by purchaser is discretionary.**

On rescission of a contract to purchase land by the purchaser, the allowance of interest on the amount paid is discretionary.

**12. Vendor and purchaser ⊷341(6)—On rescission for fraud, interest allowed against parties receiving price.**

On rescission of a contract to purchase land for fraud of the vendors and attorneys in collusion with them, interest would be allowed against each of the defendants on the amount received and retained by them.

**13. Vendor and purchaser ⊷341(5)—On rescission for fraud, purchaser entitled to recover expenditures on account of purchase, but not other expenditures.**

On rescission of a contract to purchase land for fraud, the purchaser is entitled to recover expenditures on account of the purchase before discovery of the fraud, but not expenditures in investigations prior to the purchase or expenses incident to the suit for rescission.

**14. Conspiracy ⊷16—Suit to rescind for fraud held not barred by statute applicable to conspiracy.**

A suit to rescind a contract to purchase land on the ground of fraud of the vendor and attorneys employed to give an opinion as to the title is

⊷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not barred by Ky. St. § 2516, requiring actions for conspiracy to be commenced within one year, which relates only to the technical common-law writ of conspiracy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

15. **Vendor and purchaser** ⊂⊃337—**On rescission for fraud, purchaser held entitled to lien to secure repayment.**

On rescission of a contract to purchase land, the purchaser is entitled to a lien on the land to secure repayment of the purchase price and payment of expenses, which he may be entitled to recover, and to have a decree of sale to enforce such lien.

16. **Appeal and error** ⊂⊃278—**Exceptions not brought to court's attention by agreement dispensing with specific exception.**

Exceptions to the testimony in a suit in equity are not properly brought before the court by an agreement that exceptions noted at the taking of the testimony shall be considered by the court without specific exception thereafter, as the court cannot be required to search the record for exceptions.

In Equity. Suit by the Goodrich-Lockhart Company against Oscar A. Sears and others. Decree for plaintiff in accordance with the opinion.

Dinsmore & Shohl, of Cincinnati, Ohio, Charles Stuart Guthrie, of New York City, and A. Floyd Byrd, of Lexington, Ky., for complainant.

Forman & Forman, of Lexington, Ky., and Worthington, Cochran & Browning, of Maysville, Ky., for defendant Sears.

O'Rear & Williams, of Frankfort, Ky., for defendants Harkins.

SANFORD, District Judge. This cause was submitted before me on testimony previously taken, consisting mainly of depositions, and in part of oral testimony introduced at the preliminary hearing before Judge Cochran, with various documentary exhibits. I have had no opportunity to hear the witnesses testify or to observe their demeanor on the witness stand. I have, however, carefully considered all the evidence, and the arguments and briefs of counsel. The volume of evidence and its various ramifications as applicable to the many disputed questions of law and fact, is such that it is not practicable, within the reasonable limits of a written opinion, to state the evidence in detail, with justice to the contentions of ether side. I shall hence merely state, without elaboration, the general conclusions of law and fact which, after careful study, I have reached in reference to the various controlling matters in issue.

[1] 1. J. Smith, to whom the defendant Sears gave the option, acted in the transaction in question as the agent of the plaintiff company, in which he was a stockholder, director and officer. The original employment of the defendants Harkins & Harkins by Murray, Prentice and Howland was in behalf of a syndicate of prospective purchasers of the tracts covered by the option, of which the plaintiff, through Smith, was a member; and Harkins & Harkins in the transactions in question were, by virtue of their employment, in privity with the plaintiff and under the fiduciary relation to it of attorneys to a client.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. The option covered five tracts of land purporting to aggregate 288,600 acres; one tract containing 69,900 acres in Knott and Perry Counties; three tracts, containing an aggregate of 184,000 acres in Perry County; and one tract, containing 35,000 acres in Letcher County. As the three tracts in Perry County purported to contain an aggregate of 184,000 acres, or a fraction over 280 square miles, and as Perry County, as shown by the census of 1910 (according to a certificate submitted in behalf of the defendants Harkins & Harkins) contained only 335 square miles, it appears that, exclusive of the 69,000 acre tract laying partly in Perry County, Sears was offering to sell to Smith more than four-fifths of Perry County; a county which contained, according to this census, a population of 11,255 persons.

3. The S. G. Reid patent, issued in 1872, now in issue, being the 55,000 acre tract referred to in the option, purported to grant, by its outer boundaries, 68,800 acres in Perry County, less 13,800 acres of prior patented land included therein and deducted therefrom; that is, it purported to grant 55,000 acres, or almost 86 square miles, a little less than one-fourth of Perry County, according to the census of 1910. Its boundary line came within about a mile of Hazard, the county seat. It contained, in 1912, a population. of several thousand people, was traversed by many public roads, contained many school houses, some of which were used as churches, and several school districts and voting precincts; and was in large part, an old settled country, with much cleared land, and many old buildings and with a large number of mining and timber corporations and individuals in possession of many and large portions, embracing apparently by far the greater part of its outer boundaries.

The proof shows that in fact, at the time of its issuance, at least 61,-800 acres within its outer boundaries had been previously granted under earlier and paramount patents, and that it actually conveyed title from the State to not more than six or seven thousand acres, which lay in scattered and detached portions. It was one of the series of similar blanket patents issued by Kentucky, from 1872 to 1874, which conveyed title to only a small portion of their outer boundaries; and it bore in Perry County the reputation of a "wild cat" patent conveying title to but little land. By reason of the comparatively small and scattered acreage to which it conveyed title, as well as the large number of later patents, covering about 60,000 acres, under which many adverse possessions were held, and the enormous expense of locating and settling the prior patents and the adverse possessions of squatters, it was, in spite of the large acreage value of those portions to which title could be established, of comparatively little value, as a whole, and worth nothing like the price of $178,500 at which Sears had given the option to Smith. Sears did not then even own this patent, but held an option on it himself at the price of $2,500; having obtained an option on this and other similar blanket patents from Coldwell, the purchaser at tax sales, for speculative purposes merely.

Sears was an habitual speculator in this class of specious and flimsy titles, was thoroughly familiar with the general situation, and unques-

tionably, in my opinion, knew the comparative worthlessness of the title which he proposed to sell.

Harkins & Harkins were thoroughly competent lawyers, familiar with Kentucky land titles and land law, and with the general nature of the blanket patents issued by Kentucky in the 1870's; the younger Harkins, though of less general experience than his father, having had special experience in the investigation of land titles in Perry County. I am constrained to conclude from all the surrounding circumstances that they both knew the general character of the Reid patent, and were fully aware that in all probability it only conveyed title to a small part of the 55,000 acres of paramount title which it purported to include, embracing a vastly larger acreage of prior patents than the 13,800 acres excluded on its face and conveying title to a small comparative acreage merely.

4. While the letters of Murray, Prentice & Howland were somewhat loosely worded, due apparently to their lack of familiarity with the abnormal system of land titles prevailing in Kentucky, it nevertheless sufficiently appears from the entire correspondence that Harkins & Harkins were employed to give an opinion, for the benefit of their clients, on the ultimate question whether, if they purchased from Sears, they would acquire "good title" to the land bought; and not merely whether they would acquire a valid tax title to the Reid patent, for whatever it might be worth, as a basis for subsequently acquiring a good title to the land itself by buying up the superior patents and valid possessory titles; and this, I am constrained to find, Harkins & Harkins thoroughly understood.

5. In the light of all the evidence and surrounding circumstances, I am likewise compelled, though reluctantly, to conclude and find from all the circumstances, that at some time before Harkins & Harkins gave their report on the title to the Reid patent, and probably prior to July 16th, they, at the instance of Sears, entered into a secret agreement with him that, for a money consideration to be paid to them by him, they would not disclose the real condition of the Reid title to their clients, but would give them an untrue, fraudulent and deceptive report as to the title, misleading and concealing its real condition, as a means of inducing the purchase of the Reid patent at the extravagant price at which Sears had given the option. I further find that, without making any real or substantial effort to ascertain the true condition of the title, especially as to the number and extent of the older and paramount patents—the most crucial matter affecting the validity of the patent— they gave to Murray, Prentice & Howland, for their clients, the written opinion, dated August 24, 1912. This report, "concerning the matter of the investigation of title to 55,000 acres of land situated in Perry County, Kentucky," after setting forth that the land in question purported to have been granted to S. G. Reid by patent dated June 12, 1872, for 68,800 acres, proceeded:

"From this patent there is excluded for prior claims, 13,800 acres, leaving the net number of acres, granted by said patent 55,000 acres. These exclusions are referred to in gross and are undefined and were made because of previously patented land within the exterior boundary of said patent. These

previously patented lands constituting the 13,800 acres were located principally along the streams and branches and were evidently made to include lands which were suited for agricultural purposes at the time they were made and did not extend very far on to the hillsides where the lands are chiefly valuable for coal deposits and timber."

After setting forth at length various mesne conveyances from and after Reid by which the property was acquired by the Kentucky Union Company, and the sale made for defaulting payment of taxes at which Coldwell became the purchaser, and an extended discussion of the proceedings under the tax sale and the Kentucky statutes and decisions relating to such sales, the report continued:

"It [the Reid patent] is younger than the Smith & Baum and De Groot patents, and to the extent of the conflict, the Smith & Baum and De Groot surveys will hold that part of the land covered by them. As to the older patents covering the land, it will be necessary to have the property actually surveyed and each of the patents older in date in this section of Perry County located before we can give an estimate as to the prior patented acreage.

"We feel safe in assuming, however, based upon experience with land titles throughout Eastern Kentucky and particularly in Perry County, that the 13,800 acres excluded from said patent would probably represent the correct number of acres of previously patented lands, for the reason that the surveyors making the survey had access to and were the custodians of the surveyors' books of the county and probably correctly estimated the acreage in the patents older than the Stephen G. Reid survey. However, they are susceptible of being made certain by compiling a list from the landoffice at Frankfort, Kentucky, and having them run out and located on the map within the exterior boundary lines given of the Stephen G. Reid survey.

"The foregoing report is based upon a personal inspection of the records and deeds and patents of the Perry County Court and the land office at Frankfort, Kentucky, and the records of the Circuit Court of the United States for the District of Kentucky at Louisville, which have been carefully considered by us, and attention is called that some of the deeds and mortgages herein referred to were not mentioned in the abstract of title furnished to us by you.

"Summarizing, we are of the opinion that at the time the land was surveyed under the S. G. Reid patent, there was contained within the exterior boundary thereof 68,800 acres, 13,800 acres of which was previously patented land, and therefore did not pass by the grant, but that there was within said patented boundary to S. G. Reid, 55,000 acres of vacant and unappropriated land. It is our opinion that the title passed from said Stephen G. Reid in the manner hereinbefore set out by the sundry mesne conveyances and was vested in the Kentucky Union Company at the time the same was assessed for taxation in the year 1905. * * * Under the laws of Kentucky as affecting tax sales now and as interpreted by the Court of Appeals, the presumption is indulged that the officers did their duty and it would be incumbent upon the claimant or owner of the property, in any endeavor which he might make to set the sale aside, to show that the proceedings were irregular. This the Kentucky Union Company did not attempt to do, and it is our opinion, in so far as the title of the Kentucky Union Company is concerned, that its title passed under said sale and vested in the purchaser, Sam Coldwell.

"Of course, under the sale and conveyance to Sam Coldwell, he took no greater title than the Kentucky Union Company had, and the question of adverse possession could not be determined from the record. It is a question of fact which may be proven in part by record and in part orally. * * *

"Should your clients elect to purchase this property, we would recommend they acquire the 13,800 acres of land, or if they are not able to acquire it in fee, then to acquire the coal, oil, gas and mineral rights in, on and underlying the same, with full and ample rights of way for the purpose of developing not only the 13,800 acres, but for the purpose of developing all the remainder of this outlying property. * * * Our idea for this recommen-

dation is to solidify and make into one ownership all of the land that is described within the exterior lines of the Stephen G. Reid patent, including the previously patented lands. It is not only valuable for the purpose of making it one body, and enlarging the acreage, but it gives access to the balance of the land included in the Stephen G. Reid patent to the extent of its outer boundary."

[2] Under all the circumstances, I am constrained to conclude, and do conclude and find, that the specific statement contained in this report, purporting to be based upon inspection of the records, that in their opinion at the time the land was surveyed under the Reid patent "there was within said patented boundary to S. G. Reid 55,000 acres of vacant and unappropriated land," was untrue, and that this was not their real opinion; and that the further statement that they felt safe in assuming, from their experience, that the 13,800 acres excluded from the Reid patent "would probably represent the correct number of acres of previously patented lands," was likewise untrue, and that this was not their real opinion. I further find that in spite of the incidental statements in the report that it would be necessary to survey each of the older patents in this section of the county before they could give an estimate as to the prior patented acreage and that the surveyor's estimate of the older patents was thus susceptible of being made certain, the report as a whole, by its circumstantial reference to the 13,800 acres of previously patented lands as located principally along the streams and branches, the specific reference to the Smith & Baum and De Groot patents, which alone were mentioned as older patents, the statement that from their experience they felt safe in assuming that the 13,800 acres excluded probably represented the correct acreage of previously patented lands, the specific statement of their opinion based upon a personal inspection of the records, that there were 55,000 acres of vacant and unappropriated land within the patented boundary, and the final reference to the advisability of acquiring "the 13,800 acres of land," or at least the mineral interest therein, was fraudulently intended to convey the impression to their clients that, in their opinion, there were approximately only 13,800 acres of prior patents excluded from the boundary, apparently in the Smith & Baum and De Groot patents; that while the exact extent of these prior patents could not be determined except by survey, the acreage given was in all probability correct, and there was approximately 55,000 acres of vacant and unappropriated lands within the boundary of the patent to which it conveyed good title; and that the impression thus intended to be conveyed was false, and did not represent their real opinion. A representation is however fraudulent if made with a fraudulent intent, even though there be a basis of truth underlying it, where its implications are false and made with an intent to deceive. Lee v. Lemert, 26 Kan. 111, 115 (Brewer, J., afterwards Mr. Justice Brewer).

I further find that this report was deliberately fraudulent in its failure to call the attention of their clients to the fact that they had not in fact examined the records for the purpose of ascertaining, even tentatively, the number or extent of the prior patents, or to call their attention to the real and substantial nature of the blanket patent to Reid, the

probable number and extent of the prior patents lying within its boundaries, and the real extent of the probable title thereby conveyed.

[3] I hence conclude that this report was fraudulent, both in the specific statements of opinion which it contained, as well as in the false inference intended to be thereby conveyed, and in the essential matters concealed and withheld, which the duty of counsel to clients required them to disclose.

6. I further find that the plaintiff, probably with the concurrent advice of Murray, Prentice & Howland, whose lack of experience in land titles of this character easily lead to their deception, relied upon this report as a statement from Harkins & Harkins, in effect, that the purchase of the Reid patent through the Coldwell tax title, would, in their opinion, convey title to approximately 55,000 acres of prior unpatented lands embraced within the boundary of the Reid patent, subject only to diminution by ascertaining the exact boundaries of the 13,-800 acres of prior patents, and of the possessory titles that had been subsequently acquired by squatters; that in reliance upon the opinion expressed in this report and the inference drawn and intended to be drawn therefrom, the plaintiff, through Smith, purchased the Reid patent from Sears on September 9, 1912, taking a deed therefor to Smith dated September 6, 1912; and that at the time of the delivery of this deed the plaintiff, by certified check delivered to Sears by Harkins & Harkins, paid to him, as part of the purchase price, the sum of $95,500, and on or about the same date paid as part of said purchase price, the further sum of $4,500 to one O. D. Jackson in behalf of Sears, as a commission.

7. And I further find that on the same day on which the payment of $95,500 was made to Sears, he, secretly and surreptitiously, in fulfillment of his prior agreement with Harkins & Harkins, paid to them, in money drawn by him from the bank, the sum of $12,500, in consideration of the fraudulent opinion given by them in reference to title to the property and the aid thereby given by them in bringing about and inducing the purchase of the land from him; and that even if the younger Harkins at the time executed and delivered to Sears an option of purchase on 41,000 acres of land which he claimed under a tax title, of whose validity Sears then knew practically nothing, this was not the true consideration of such cash payment, but a mere pretense and sham to cover up the real nature of the transaction.

And Sears thereupon attempted, as expeditiously as practicable to cover up in the name of other persons that portion of the purchase price which he had himself retained.

[4] 8. Thereafter (a deed having in the meantime been executed by Smith and wife to the plaintiff), Sears, at the instance of the plaintiff, executed and delivered to the plaintiff a deed, dated October 9, 1912, whereby he conveyed the land in question directly to the plaintiff; this deed being intended by the parties as a substitute for the former deed to Smith. The plaintiff at the same time executed its promissory note to Sears for $78,750 as the balance of the purchase price, which, together with a mortgage from the plaintiff to Sears to secure the payment of the note, were delivered in escrow to await a determination

of the extent, if any, to which credit should be given on the note by reason of deduction in purchase price due to deficiency in acreage. I find, however, that at the time this new deed was executed and delivered and the note and mortgage executed and delivered in escrow, the plaintiff had not ascertained the fraud that had been practiced upon it; the investigation of the title which it had made in the meantime merely leading it to believe that there would be a comparatively slight deficiency in acreage by reason of an excess in the prior patented land over and above the 13,800 acres, against which it would be fully protected by credit on the note deposited in escrow. And I am therefore of opinion that the acceptance of this new deed and the execution of these papers in October did not constitute an affirmance by the plaintiff of its original purchase with knowledge of the fraud that had been perpetrated upon it, under the doctrine of McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. 29, 35 L. Ed. 804, and other cases, or deprive it of the right to rescind the transaction on account of fraud, when subsequently ascertained; for which purpose its bill was seasonably filed.

[5] I further find that the small portions of land inside of the Reid patent to which the plaintiff derived title under its purchase from Sears, are not, for the reasons already stated, worth the sum of $100,000.00 or substantially that amount; and that it has suffered great financial injury through the fraud practiced upon it, inducing it to pay this sum on the purchase price therefor. Furthermore where the false representation is as to quantity and the vendee obtains title to only a small portion of the purported quantity, the vendor being unable to convey title to a material portion constituting the principal inducement of the purchase, this itself is such injury as to entitle the purchaser to rescission. In such case he is necessarily injured by failing to receive for the consideration paid a material portion of the property which he expected to obtain for such consideration. See as to rescission in such case: 2 Black on Rescission, sec. 423, p. 144, and cases cited in note 143; and 6 Cyc. 341 and cases cited in note 77.

[6] 9. The fraud thus practiced upon the plaintiff whereby it was induced to purchase this Reid patent and to make a cash payment therefor largely exceeding the real value of the land, as well as causing it to obtain title to only a small portion of the land which it expected to receive in consideration for such payment is, in my opinion, such as to fully entitle it to maintain this bill for rescission of the purchase. The case presented is not that of an opinion fraudulently expressed by a prospective vendor as to the value of that which he proposes to sell, which is regarded as mere "trade talk," upon which the prospective purchaser is not entitled to rely, or of a purchase on the vendee's own independent investigation, without interference by the vendor, as in Southern Development Co. v. Silva, 125 U. S. 247, 256, 259, 8 Sup. Ct. 881, 31 L. Ed. 678, and other cases. An opinion expressed to a prospective purchaser by his attorney as to the validity of a title which he is about to purchase, which the attorney is bound to render honestly by virtue of his fiduciary relation, is not mere "trade talk," but is a representation of fact as to his real opinion upon which the client is entitled to rely; and if such opinion be falsely stated, at the instance

of the prospective seller and by collusion with him, it is, in my judgment, clearly a false statement of fact, to-wit, as to the opinion of the attorney and constitutes ground for rescission of the purchase thereby induced.

[7] 10. For present purposes, I assume, without determination, that the plaintiff, a foreign corporation, had, prior to the delivery of the deed to Smith, dated September 6th, as well as prior to the delivery to it of the deed dated October 16th, carried on business in the State of Kentucky, through the agency of Smith and otherwise, and that under the provisions of sec. 571 of the Kentucky Statutes, its failure to file in the office of the Secretary of State of Kentucky a statement giving the location of its office in the State and the name of its agent thereat, until October 16, 1912, would, under the Kentucky statute and decisions, render the contracts whereby it purchased the land in question unenforceable; and that no action would lie to enforce the same, at least in the courts of Kentucky, and perhaps in the Federal courts within the State. But however this may be, I am of opinion that these statutes do not deprive the plaintiff, as a foreign corporation, of the right to maintain, either in the courts of Kentucky or in the Federal courts therein, a bill to rescind these transactions for fraud, in which it does not seek to enforce any contract made in the carrying on of business in Kentucky, but on the contrary proceeds in derogation of such contracts and in the effort to set the same aside. This is not to affirm, but to disaffirm the transaction in question. See Central Transp. Co. v. Car Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 35 L. Ed. 55.

I find no precise authority in support of this conclusion; but think it is not only sound in principle but also finds strong support in the well settled rule that similar statutes in reference to the doing of business within a state by foreign corporations do not prevent such non complying foreign corporations from maintaining, even in the courts of the State, actions ex delicto. Delaware & A. Telegraph & Telephone Co. v. Pensauken Tp. (C. C.) 116 Fed. 910, 911; Louisville Property Co. v. Nashville, 114 Tenn. 213, 215, 84 S. W. 810; 19 Cyc. 1304, and cases cited in note 35. In Delaware & A. Telegraph & Telephone Co. v. Pensauken Tp. (C. C.) 116 Fed. 910, supra, the court said that the prohibition against a foreign corporation from transacting business "does not subject its property to wanton destruction." So an agent who has collected and retains property of his principal is, on grounds of public policy, estopped, when sued by his principal therefor, from relying upon the non compliance of his principal with the foreign corporation statutes of the State as a defense to such action. Insurance Co. v. Kennedy, 96 Tenn. 711, 716, 36 S. W. 709; Packet Co. v. Agnew, 132 Tenn. 265, 271, 177 S. W. 949, L. R. A. 1916A, 640. In like manner I am of opinion that one who has induced a foreign corporation by fraud to enter into a contract with it, is, on grounds of public policy, estopped, when sued by the foreign corporation for rescission of such contract, from relying upon its non compliance with the foreign corporation statute of the State as a defense to such action. Such statute does not subject it to being deprived of its property by fraud any more than by other tortious act. The instant case is in this respect clearly distinguishable from Fruin-

Colnon Cont. Co. v. Chatterson, 146 Ky. 504, 143 S. W. 6, 40 L. R. A.
(N. S.) 857, in which the plaintiff affirmatively relied on the contract
under which it was doing business in Kentucky, predicating its claim to
a lien on the defendant's property on the work which it had done under
such contract.

[8] And since the plaintiff is entitled to maintain the bill for rescis-
sion and to be granted relief predicated upon this theory, it is not de-
prived of such right by reason of non compliance with the statutes
merely because it has prayed in its bill alternative relief looking on the .
reformation of the deed, which is not granted. The defense raised by
the answers under sec. 571 of the Kentucky statutes accordingly can-
not be sustained.

[9-12] 11. Upon rescission of the purchase, the plaintiff is likewise
entitled to recover the amount paid by it to Sears as consideration on
the purchase price of the land, consisting of the $95,500 paid directly
to Sears and the $4,500 paid for Sears' account to Jackson. Wilson
v. Ranch Co. (8th Circ.) 73 Fed. 994, 997, 20 C. C. A. 241; Lanier v.
Hill, 25 Ala. 554, 559; Foster v. Gressett's Heirs, 29 Ala. 393, 397; Mc-
Williams v. Jenkins, 72 Ala. 480, 487; Bibb v. Prather, 1 Bibb (Ky.)
313, 315, 2 Black on Rescission, § 694, p. 1569, and cases cited in note
87; 6 Cyc. 341. And since this payment was, in my opinion, induced by
the joint fraud of all the defendants, the plaintiff is entitled to a decree
for this amount against them all. Watts v. Mortgage Co. (5th Circ.)
60 Fed. 483, 486, 9 C. C. A. 98, affirming Lee v. Lemert, 26 Kan. 111
sup.; Milliken v. Frisbie, 89 Misc. Rep. 579, 153 N. Y. Supp. 751.
And see Bigelow on Fraud, p. 246. The allowance of interest, in my
opinion, is discretionary. See, by analogy, as to allowance of interest
on the recovery of damages for torts, Lincoln v. Claflin, 7 Wall. 132,
139, 19 L. Ed. 106; Redfield v. Iron Co., 110 U. S. 174, 176, 3 Sup.
Ct. 570, 28 L. Ed. 109; Arnold v. Horrigan (6th Circ.) 238 Fed. 39,
47, 151 C. C. A. 115; New York Trust Co. v. Detroit Ry. (6th Circ.)
251 Fed. 514, 523, 163 C. C. A. 508; and cases cited. In the exercise
of this discretion, I am of opinion that interest should be allowed
against the defendants from September 9, 1912, on the sums which
they respectively received and of which they have had the benefit,
that is, against Sears on the $83,000, which he received and personally
retained, and against the defendants Harkins on the $12,500 which their
firm received.

[13] 12. The plaintiff is also entitled upon rescission to a decree
against all the defendants for the amount which it has naturally ex-
pended on account of the purchase, before the fraud was discovered
(Wilson v. Ranch Co. [8th Circ.] 73 Fed. supra, at page 977, 20 C.
C. A. 241), including money spent in care and preservation of the
property (2 Black on Rescission, § 694, p. 1569) and in attempting to
utilize the property before the fraud was discovered (Id. § 695, p.
1570), and the necessary expenses in subsequent examination of the
title leading to the discovery of the fraud practiced upon it. Such
recovery, however, cannot properly include either the amounts spent by
it in investigating the property prior to the purchase or the expenses in-
cident to this suit, such as the expenses of surveyors employed to exam-

ine the property preliminary to giving their testimony. The expense account, which has been exhibited by the plaintiff in its proof, is entirely too general to serve as the basis for a decree in this behalf, and includes many items, such as expense incurred prior to the purchase, which can form no part of its recovery. As it appears, however, that it has incurred substantial expense for which a recovery should be allowed, a reference will be had to a master to ascertain and report the amount of such expense for which the defendants are liable. Such report will be made upon the testimony already taken and such additional testimony as may be offered by the parties.

[14] 13. I further am of opinion that the plaintiff's right of action is not barred by sec. 2516 of the Kentucky Statutes providing that actions for "conspiracy" shall be commenced within one year, upon which the defendants Harkins rely in their answer. This, I am of opinion, relates only to the technical common law writ of conspiracy, which is of a very limited scope (8 Cyc. 645), and has no reference either to an action on the case in which conspiracy is charged, which does not change the cause of action alleged, but is merely important as it may affect the means and measure of redress (8 Cyc. 647), or to the substantive equitable action of rescission, brought for the purpose of rescinding a contract induced by fraud, in which as here, conspiracy is incidentally charged merely as a form of alleging the joint fraud and collusive action of the defendants.

[15] 14. The plaintiff is also entitled to a lien on the land in controversy to secure the payment of the money decrees rendered in its favor against the defendants, both for the purchase price paid and for the expenses which it may be entitled to recover, and decree of sale to enforce such lien. 2 Black on Rescission, § 694, p. 1564, and cases cited in note 87; 6 Cyc. 341, and cases cited note 78.

[16] 15. At the hearing before me, no exceptions were made or noted to any of the testimony; and none are referred to in the briefs. I have accordingly not ruled upon any exceptions therein contained. I note that in one instance, at least, it was agreed that exceptions noted at the taking of certain testimony should be considered by the court without specific exception thereafter. This, however, is not a proper way of bringing exceptions to the attention of the court; which cannot properly be required to go through a large record of this character and rule upon all the various exceptions noted when the testimony was taken; many of which were obviously of a purely tentative character and would not have been finally relied upon. Furthermore many, if not the majority, of these exceptions, are of a merely general character for supposed "incompetency," and specify no ground of objection which requires a ruling by the court. No ruling is hence made upon any of the exceptions appearing in the testimony.

16. A decree will accordingly be entered sustaining so much of the bill as relates to the rescission of the purchase of the Reid patent from the defendant Sears, and awarding the plaintiff a recovery against all the defendants for the $100,000 paid to and for Sears as part of the purchase price, with interest on portions thereof against the different defendants, as hereinabove provided; cancelling its note for $87,500,

the mortgage delivered in escrow and agreement; and also adjudging in favor of the plaintiff a lien on the land embraced in said Reid patent to secure the money decrees awarded to it in this cause. This decree will also provide for a reference to a master to ascertain and report the amount of expenses for which the defendants are liable, in accordance with this opinion; and will award against the defendants all costs of the cause heretofore accrued.

The decree of sale to enforce the lien will be reserved until the amount of the expenses for which the defendants are liable has been determined.